USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1-23-08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- x
G & G STEEL, INC.,

                Plaintiff,

       -against-

SEA WOLF MARINE TRANSPORTATION, LLC,:

                Defendants.
------------------------------------------------------------- x

06 Civ. 1840 (CSH)

MEMORANDUM OPINION
AND ORDER

HAIGHT, Senior District Judge:

Plaintiff G & G Steel, Inc. ("G&G") moves pursuant to Rule 15, Fed. R. Civ. P., to amend its complaint. Defendant Sea Wolf Marine Towing, LLC. ("Sea Wolf") resists the motion.

## I. FACTUAL BACKGROUND

G&G filed its original complaint ("OC") on March 8, 2006. It asserted claims against defendant Sea Wolf Marine Transportation, LLC. The parties have subsequently agreed that the proper name of the corporate defendant is Sea Wolf Marine Towing, LLC., the name that appears in the proposed amended complaint.

According to the allegations of the OC, in August 2002 G&G entered into a written agreement with KiSKA Construction Corporation-USA ("KiSKA") which obligated G&G to fabricate and deliver to a designated location New York Harbor manufactured components for the replacement of the Third Avenue Bridge, which spans the Harlem River. One of the components was called the Bridge Span.

In April 2004, G&G entered into a time charter party with McDonough Marine Service ("McDonough"), the owner of the barge MARMAC 400. G&G chartered the MARMAC 400 for the purpose of transporting the Bridge Span from Chickasaw, Alabama to New York Harbor. On June 27, 2004, a tug with the engaging name of ATTABOY towed the MARMAC 400, laden with the Bridge Span, from the Alabama port to Ambrose Point, near New York Harbor. That passage was completed without incident.

KiSKA contracted with Sea Wolf to tow the MARMAC 400, still laden with the Bridge Span, from Ambrose Point into New York Harbor, up the Harlem River, to the Third Avenue Bridge jobsite. The OC alleged that Sea Wolf understood at the time that the MARMAC 400 had been "leased" (that is to say, chartered) by G&G. During the passage up the Harlem River, Sea Wolf lost control of the MARMAC 400,[1] causing the barge to suffer an allision with the embankment of a bridge,[2] and one or more groundings. As a result of these mishaps, the MARMAC 400 suffered extensive damage in her number five starboard compartment. She was surveyed afloat in the Harlem River on July 18 and 19, 2004, and repaired at a shipyard in Amelia, Louisiana, during the period August 9-August 25, 2004.

G&G's OC against Sea Wolf alleged damages in the total amount of $236,322.00. That amount is comprised of a $50,000 deductible G&G had to pay under a hull policy of insurance covering its use of the MARMAC 400; rental under G&G's lease of the barge from McDonough

---

[1] The original complaint did not identify the vessels Sea Wolf dispatched to perform the tow. As noted in Part II., *infra,* the tugs are named in the proposed amended complaint.

[2] "An allision is the impact of a moving vessel with a stationary vessel or other stationary object." *Conti Corso Schiffahrts-Gmbh & Co. v. M/V PINAR KAPTANOGLU,* 414 F. Supp. 2d 443, 444 (S.D.N.Y. 2006) (Koeltl, *J.*).

during the repair period; rental of a tug to shift the barge from the repair yard to the McDonough facility; and the cost of a survey of the damage to the barge.

## II. PROCEDURAL BACKGROUND

As noted, G&G's OC named Sea Wolf as the sole defendant. Subject matter jurisdiction was based upon diversity of citizenship. The complaint pleaded two causes of action: the first for negligence, and the second for breach of contract, G&G characterizing itself as the third-party beneficiary of the contract between KiSKA and Sea Wolf. The OC demanded a jury trial.

In its proposed amended complaint ("PAC"), drafted in July 2007, G&G again asserts claims for damages arising out of hull damage to the MARMAC 400 during her passage up the Harlem River to the jobsite under the control of Sea Wolf. The PAC alleges that "[p]ursuant to its contract with KiSKA, and with the understanding that the MARMAC 400 had been chartered by G&G, Defendants took possession of the MARMAC 400 and the Bridge Span from the ATTABOY near Ambrose Reach." ¶ 15. As for the casualty itself, the PAC alleges at ¶ 18: "The MARMAC 400, while under the control and tow of Defendants, was damaged when the Masters of the SEA BULL, SEA OX, and SEA LION allowed the MORMAC 400 to fall against and drag along the southwest corner of Mill Rock." Apparently G&G, presumably after some pretrial discovery, no longer alleges that an allision occurred between the barge and a bridge embankment.

The amount of G&G's damages is increased to $272,012.36, reflecting additional charges and expenses of the same sort alleged in the original complaint.

The PAC named Sea Wolf, William Wittich, and Jerry Burdsall as defendants *in personam* and the tug M/V SEA LION as the defendant *in rem*. Wittich is alleged to have been the master of

3

the SEA LION and Burdsall the master of the tug SEA OX at the time of the grounding.[3] During briefing on the present motion, and for reasons that need not be recited here, G&G dropped its claims against Wittich and Burdsall. In consequence, the PAC now asserts claims against Sea Wolf *in personam* and the SEA LION *in rem* only.

The PAC alleges that the Court has subject matter jurisdiction pursuant to the diversity statute, 28 U.S.C. § 1332, and also has admiralty and maritime jurisdiction pursuant to § 1333. The PAC states: "Trial by jury is waived."[4]

In the PAC, G&G asserts five causes of action against Sea Wolf and the SEA LION: (1) as third-party beneficiary of the contract between KiSKA and Sea Wolf to transport the MORMAC 400 to the Third Avenue Bridge jobsite; (2) as third-party beneficiary of the implied warranty of workmanlike performance contained in that contract; (3) "tort indemnity" as the result of G&G being cast in damages to McDonough by reason of defendants' negligence; (4) negligence; and (5) breach of statutory obligations imposed by the Inland Navigation Rules, 33 U.S.C. §§ 2001-2038.

The papers submitted by defendants in opposition to the motion show that the incident in question generated a spate of other litigation. Specifically, in an action commenced in this Court by KiSKA against G&G (No. 04-CV-9252), G&G asserted counterclaims against KiSKA for money damages arising out of the casualty to the MORMAC 400; in an action commenced in the Eastern District of Louisiana by McDonough against G&G (Civil No. 06-1735), G&G asserted a

---

[3] It does not appear from the PAC why the unnamed master of the tug SEA BEAR is not made a defendant *in personam*, or why the tugs SEA BEAR and SEA OX are not made defendants *in rem*.

[4] With respect to G&G's claim against the SEA LION *in rem*, there is no right to trial by jury to waive because none exists.

4

counterclaim against McDonough for declaratory relief and breach of McDonough's contract with G&G to provide G&G with insurance; and, in an action commenced in the Northern District of Alabama by Zurich American Insurance Company against G&G (Case No. 07-J-0733), G&G asserted a counterclaim for declaratory relief with respect to coverage under a charterer's liability policy. The action in this Court between KiSKA and G&G was settled and all claims and counterclaims dismissed by an order entered on November 22, 2006 on the joint application of the parties. So far as appears, the Louisiana and Alabama actions are still pending. Sea Wolf suggests in its briefs that this Court should defer its ruling on GG&G's motion to amend until those cases have been resolved. I decline to do so.

## III. DISCUSSION

Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleading "only by leave of court or by written consent of the adverse party; and leave should be freely given when justice so requires." In oft-quoted words, the Supreme Court has said that "[i]n the absence of any aparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencis by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962).

In opposing the amendment, Sea Wolf argues principally that it would be futile. "Futility" in the context of Rule 15(a) means, *inter alia*, that courts will not grant leave to amend when the proposed amendment "could not withstand a motion to dismiss." 3 *Moore's Federal Practice* § 15.15[3], p.15-48 (3d ed. 1997). Sea Wolf contends that G&G's asserted admiralty claims for

5

economic damages are barred by the rule of *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927).[5]

In *Robins Dry Dock*, a vessel was negligently damaged while undergoing scheduled maintenance at a dry dock. The damage delayed the vessel's return to operation. During that time, the vessel was subject to a time charter. The time charterer sued the dry dock for damages resulting from the loss of use of the vessel due to the delay. In denying recovery to the charterer, the Supreme Court held broadly that in admiralty cases, the general rule is that "a tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with the other, unknown to the doer of the wrong." 275 U.S. at 309. *Robins Dry Dock* has generally been interpreted as establishing a bright line barring recovery for economic losses caused by an unintentional maritime tort absent physical damage to property in which the victim has a proprietary interest. The Second Circuit and this Court have applied that interpretation of *Robins Dry Dock*. *See Federal Commerce & Navigation Co., Ltd. v. The M/V MARATHONIAN*, 528 F.2d 907 (2d Cir. 1975 (per curiam) (holding that *Robins Dry Dock* barred a time charterer's claim for loss of use that resulted from the chartered ship being laid up after a collision with defendant's vessel); *Alders Int'l (Ships) Ltd. v. United States*, No. 94 Civ. 5689, 1995 WL 251571 (S.D.N.Y. Apr. 28, 1995) (holding that the rule of *Robins Dry Dock* barred recovery of a cruise ship concessionaire's lost profits that resulted from the cancellation of cruises during repairs after an

---

[5] G&G states incorrectly in its Reply Brief at 5-6 that of the reasons articulated by *Foman* and its progeny for denying leave to amend, "the only reason one that Sea Wolf asserts as a basis to deny G&G's Motion for Leave is prejudice, and its argument based in this regard is baseless." Sea Wolf relies on *Robins Dry Dock* in aid of an argument that the proposed amendment would be futile because *Robins Dry Dock* bars G&G's admiralty claims as a matter of law.

6

accidental grounding).[6]

G&G contends that the *Robins Dry Dock* rule does not bar its admiralty claims against Sea Wolf because G&G had a proprietary interest in the MORMAC 400. If that is so, G&G would avoid the *Robins Dry Dock* bar, but G&G's status as the time charterer of the barge presents a difficulty. In *Gas Natural SDG S.a. v. United States*, No. 04 Civ. 8370, 2007 WL 959259 (S.D.N.Y. Mar. 22, 2007), Judge Batts stated:

> In cases of unintentional maritime tort, a party cannot recover for pecuniary damages flowing from damage to a vessel unless that party has a proprietary interest in the vessel. A proprietary interest requires actual possession and control, responsibility for repair and responsibility for maintenance. A typical time-charterer does not have a proprietary interest in a vessel.

*Id.*, at *3 (citations and internal quotation marks omitted). G&G places primary reliance on *In re Moran Enterprises Corp.*, 77 F. Supp. 2d 334 (E.D.N.Y. 1999), where Judge Spatt said that, notwithstanding the *Robins Dry Dock* rule, "[a] Plaintiff may recover even for purely economic loss when he has suffered physical damage to a proprietary interest," and that "[i]n order to have a proprieatry interest actual ownership or title is not necessary." *Id.* at 340-41 (citations and internal quotation marks omitted). These words taken alone may appear to give G&G some comfort, but Judge Spatt followed them by saying: "The factors to be considered in the determination of whether the plaintiff has a proprietary interest are actual possession or control, responsibility for repair and responsibility for maintenance." *Id.*

G&G tries to fashion these indicia of its proprietary interest in the MORMAC 400 out of certain provisions in the time charter G&G entered into with McDonough, the barge owner. G&G

---

[6] The analysis contained in this paragraph of text is adapted from Judge Koeltl's well-reasoned and helpful opinion in *Conti Corso Schiffahrts-GMBH & Co. v. M/V PINAR KAPTANOGLU*, 414 F. Supp. 2d 443, 446-47 (S.D.N.Y. 2006).

7

argues in its Reply Brief at 7 that the charter "obligated G&G to maintain the MARMAC 400, repair damage to the MARMAC 400 and waive subrogation with regard to McDonough Marine and the MARMAC 400," and also "obligated G&G to pay a $50,000 Hull deductible and purchase general liability insurance for McDonough Marine and the MARMAC 400." "These facts," G&G concludes, "demonstrate G&G had a proprietary interest in and assumed the risk of physical damage to the MARMAC 400."

I do not agree. The charter party and the insurance policies it calls for do not rise to the level of establishing G&G as the holder of a proprietary interest in the barge, as that phrase is defined by the cases. G&G's professed duty to "maintain the MARMAC 400" and "repair damage" to her is derived from the charter party provision that G&G agreed "to maintain the barge in a good and seaworthy condition during the term of the charter, and will return same to [Mcdonough Marine] in the same good, seaworthy and clean condition as when the barge was received, fair wear and tear excepted." This is a standard provision in charter parties, time or voyage, and is not thought of as conferring a proprietary interest in the chartered vessel upon the charterer. Nor do the several insurance policies called for by the charter party, Ex. A to the declaration of Edward A. Keane, have that effect. McDonough agreed to provide and pay for hull and P&I insurance on the barge, naming G&G as an additional assured and waiving subrogation, with G&G agreeing to pay a $50,000 deductible on any claim (such as the one that arose as the result of the casualty in suit). G&G agreed to provide and pay for "Comprehensible [*sic*] General Liability"[7] insurance, naming McDonough

---

[7] The word "Comprehensible," which appears in the charter party, is probably a misspelling of "Comprehensive," the adjective more frequently used to modify liability policies. But perhaps not; the draftsmen may have been aware of the frequency with which insurance policies are incomprehensible.

8

and the barge as additional assureds, again with waiver of subrogation. These unremarkable charter party provisions for insurance fall well short of demonstrating that "actual possession or control, responsibility for repair and responsibility for maintenance" necessary to create a proprietary interest of G&G in the MARMAC 400.

The facts in *Moran*, upon which G&G places its primary reliance, are materially different. The Connecticut Light and Power Company ("CL&P") and the Long Island Lighting Company ("LILCO") jointly contracted to install and maintain submarine electrical cables running along the sea bed of the Long Island Sound between CL&P's power plant in Norwalk, Connecticut and LILCO's power plant in Northport, New York. A Moran tug, failing to control a Moran barge that broke loose from its moorings at the LILCO offshore platform, dropped its anchor and damaged the cables. Moran contended that *Robins Dry Dock* precluded CL&P's claim for economic damages resulting from this maritime accident. In Judge Spatt's view, the applicability of *Robins Dry Dock* turned upon whether CL&P had a proprietary interest in the cables, a question that could not be resolved by summary judgment. He reasoned:

> [T]he Court finds that, at a minimum, there exists material issues of fact with regard to whether CL&P has a proprietary interest in the damaged cables. CL&P and LILCO jointly contracted to have the cable built and installed; shared the original costs of its construction; maintain a single insurance policy; are jointly liable for environmental harm that occurs anywhere along the cable; and both assumed the responsibility of co-ownership by agreeing to share all cable related repair and maintenance expenses over the life of the cable. Moreover, evidence of CL&P's proprietary interest in the cable is demonstrated by the uncontroverted fact that CL&P expended more than $11 million in repair costs to the cables when the damage was located off the coast of Long Island, New York.
>
> As such, it is clear that material triable issues of fact exist as to whether CL&P has a proprietary interest in the damaged cables.

9

77 F. Supp. 2d at 341. Accordingly the court denied Moran's motion for summary judgment dismissing CL&P's claim on the basis of *Robins Dry Dock*. It requires no analysis to demonstrate that the facts of *Moran* bear no resemblance to those of the case at bar.[8]

As noted, the PAC alleges that Sea Wolf entered into its contract with KiSKA "with the understanding that the MARMAC 400 had been chartered by G&G." There are no further allegations as to how that "understanding" came about and what form it took. One senses in Sea Wolf's briefs a dispute that such an understanding existed, but I accept on this motion the truth of this barebones assertion. While G&G does not argue the point in detail, preferring instead to attempt (unsuccessfully) to demonstrate a proprietary interest in the barge, this allegation was presumably included in an effort to avoid the *Robins Dry Dock* rule. In *Robins Dry Dock*, the Supreme Court noted that the defendant dry dock owner "seems to have had no notice of the charter party until the delay had begun," 275 U.S. at 308, and Justice Holmes's opinion recites that "as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other *unknown to the doer of the wrong.*" *Id.* at 309 (emphasis added). However, I do not read *Robins Dry Dock* to suggest that such knowledge of the charter party on the part of the dry dock owner would have allowed the time

---

[8] In urging its contention of proprietary interest, G&G relies on other decisions by district courts outside this circuit. They have no precedential value in this Court, and in any event the underlying facts are again quite different. *See, e.g., McLean Contracting Co. v. Waterman Steamship Corp.*, 131 F. Supp. 2d 817, 821 (E.D. Va. 2001) ("It is undisputed that McLean had 'charge and care' of the entire trestle, including its work-in-progress, and was required to make all necessary repairs to the project."); *Holt Hauling & Warehousing Systems, Inc. v. M/V MING JOY*, 614 F. Supp. 890, 900 (E.D. Pa 1985) (distinguishing *Robins Dry Dock* on the ground that "[t]here is no danger of duplicative litigation in permitting one who exercises virtually unlimited control over a facility to bring suit when the facility suffers physical damage.").

charterer to recover its economic damages, and I am unaware of any subsequent case reaching that result.

For the foregoing reasons, the Court holds that the admiralty claims G&G seeks to assert in its proposed amended complaint are precluded by the rule of *Robins Dry Dock*. Accordingly its motion to amend is denied on the ground of futility.

The Court will set up a telephone conference with counsel to consider the status of the case in the light of this Opinion.

It is SO ORDERED.

Dated: New York, New York
January 23, 2008

/s/ Charles S. Haight
CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE